IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 3, 2019 Session

IN RE BENJAMIN P., ET AL.[1]

**Appeal from the Juvenile Court for Hamilton County**
**Nos. 284229, 284230     Robert D. Philyaw, Judge**

_____

**No. E2019-01022-COA-R3-PT**

_____

This action involves the termination of a mother's parental rights to her two minor children. Following a bench trial, the trial court found that clear and convincing evidence existed to support the statutory ground of the persistence of conditions which led to removal. The court also found that termination was in the best interest of the children. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II and CARMA DENNIS MCGEE, J.J., joined.

Ardena J. Garth, Chattanooga, Tennessee, for the appellant, Mary W.

Herbert H. Slatery, III, Attorney General & Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

John Allen Brooks, Chattanooga, Tennessee, Guardian Ad Litem

**OPINION**

## I.     BACKGROUND

Benjamin P. and Lyric W. were born to Mary W. ("Mother") in July 2012 and December 2014, respectively. Benjamin's father has since passed away, and Mother has

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

not identified Lyric's father. No claims of paternity have been made. On April 30, 2015, Lyric was hospitalized for failure to thrive. The Department of Children's Services received a referral based upon allegations of environmental and nutritional neglect. Lyric was underweight and had not received follow-up care for her club feet as recommended by medical professionals, while Benjamin appeared dirty on multiple occasions and smelled strongly of urine. DCS had trouble locating Mother's residence, but Mother eventually advised them that she was living in a hotel room and that her mother and grandmother had plans to move in with them because their residence had recently been condemned. The hotel room appeared unkempt with accumulated clutter and garbage.

DCS removed Benjamin and Lyric (collectively "the Children") on May 11, 2015. The Children were placed in the same foster home and were adjudicated as dependent and neglected. This was not Mother's first interaction with DCS. Her rights had been terminated to two other children based upon findings of environmental neglect, while a third child was currently living with a relative. DCS had also received prior referrals regarding the Children at issue here; however, DCS had difficulty locating Mother.

DCS developed several permanency plans throughout the longevity of the case. Pursuant to the plans, Mother was required to, inter alia, maintain a safe living environment; participate in a mental health intake and follow recommendations; actively participate in counseling as recommended; participate in a parenting assessment and follow recommendations; participate in parenting classes and comply with homemaker services; pay child support; visit the Children; and provide proof of income. Mother was cooperative, at first, and worked to complete the requirements. She obtained government housing, applied for disability benefits, and attended Lyric's doctor's appointments. Lyric had surgery while in DCS custody and was discharged from the hospital with castings on her legs. Mother also obtained employment but was unable to maintain said employment as a result of her medical condition.[2]

Meanwhile, DCS conducted a home study and found no issues with the home in April 2016. DCS began to transition the Children for a trial home visit. During that time, Mother's visitation increased and was unsupervised. The Children were then placed into the home for a 90-day trial home visit, beginning on May 8, 2017. The trial home visit was extended to allow Mother more time to secure employment and evidence her ability to care for the Children. Throughout the trial home visit, Mother had difficulty maintaining employment and arriving at the Children's medical appointments on time. Her residence also appeared unkempt and cluttered as the trial home placement progressed. DCS recommended termination of the trial home visit in August 2017. The court terminated the visit as recommended on August 17.

---

[2] Mother testified that she was born with club feet and had difficulty standing for long periods of time.

Mother then refused homemaker services to assist her in addressing her hoarding tendencies and also discontinued her counseling sessions. The condition of her home continued to deteriorate, leading DCS to move visitation to a neutral location due to the unsafe condition of the home. DCS last visited the home on June 8, 2018, and found that the residence was without electricity or water. There was also standing water in the kitchen that Mother confirmed had been there for approximately one month. Mother later confirmed that her home was in the same condition on August 8, 2018, but claimed that she had filed two complaints with Section 8 housing but had not been provided any relief. DCS finally filed a petition to terminate her parental rights on August 28, 2018, based upon the statutory grounds of failure to establish a suitable home and the persistence of conditions which led to removal.

The case proceeded to a hearing on February 22, 2019, and was later concluded on March 27. At the first hearing date, Mother confirmed that two of her older children had also been removed from her care due to issues of environmental neglect. She explained that at that time, she lived with her mother and grandmother, who both had issues with hoarding. She denied any issues with hoarding.

Mother testified that she and the Children were living in a hotel at the time of their removal because she did not want to live with her mother, whose residence was later condemned. She stated that since removal, she has obtained employment but had difficulty maintaining her employment due to her medical condition and missed work due to attending the Children's many appointments. However, she claimed that she had again obtained employment and was scheduled to begin work in a few weeks at a new restaurant in town.

Mother admitted that she had difficultly arriving at the Children's medical appointments at the appointed time. She agreed that she had issues with time management and explained that she was addressing these concerns with her counselor. She testified that she attempted to complete the permanency plan requirements and had accepted homemaker services at one point. She agreed that she also later rejected services. She explained that her mother had started using the carport area for her own use and that she hoped her mother would clean up the mess. She stated that she also attempted to address the ongoing concerns with the condition of the inside of her home but that most recently, her landlord refused to repair damage following a flood and a fire that occurred in the residence, despite her filing of an official appeal with Section 8 housing. She testified that she has been without a home since November 2018 and that she slept in a wooded area near Eastgate Town Center prior to the hearing. She planned to obtain adequate housing again once her employment started.

Mother's multiple caseworkers testified concerning Mother's longstanding involvement with DCS. They agreed that Mother had made some progress and was ultimately granted a trial home placement but that she was unable to maintain her progress once the Children were returned to her care. A plethora of pictures were introduced documenting the condition of the residence throughout the case. The residence appeared unkempt and cluttered with personal items and garbage. In addition, testimony established that insects were present, animal feces was on the wall, the residence had an unpleasant odor, and cleaning chemicals were in reach of the Children.

Foster Mother confirmed that the Children were doing well and had shown significant improvement since their placement. She expressed a desire to adopt them, if they should become available for adoption. She was familiar with Lyric's medical needs and evidenced her intent to provide the necessary care. She stated that the Children "jumped right back into life" when they returned from the trial home placement. She claimed that the Children had also adjusted well to their current visitation schedule with Mother and explained that the Children were happy to attend visitation and happy to return from visitation.

Following the hearing, DCS withdrew the statutory ground of failure to provide a suitable home but submitted the case to the court on the remaining ground of the persistence of conditions which led to removal based upon Mother's ongoing environmental neglect of the Children. The trial court granted the termination petition on the remaining ground of the persistence of conditions. The court also found that termination was in the best interest of the Children. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.    Whether the court abused its discretion in its ruling on the admissibility of evidence.

B.    Whether clear and convincing evidence supports the court's termination based upon the persistence of conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

C.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Children pursuant to Tennessee Code Annotated section 36-1-113(i).

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).  This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).  "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)).  "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds.  *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).  Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97.  A parent's rights may be terminated only upon

> (1)  [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2)  [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c).  "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).  Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003).  This evidence also eliminates any serious or substantial doubt about the

correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

## IV. DISCUSSION

### A.

Mother argues that the court erred in its decision to exclude evidence that she had not been admitted to Moccasin Bend Mental Health Institute ("MBHI") as alleged by DCS and relied upon by the trial court in terminating her parental rights to her older children. The record reflects that the court denied admission of the document because it was not properly authenticated; however, Mother was permitted to testify that she was not admitted to MBHI as indicated by DCS.

"Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). "The trial court's decision to admit or exclude evidence will be overturned on appeal only where

there is an abuse of discretion." *Id.* Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

Our review of the record reflects that the exclusion of the evidence, even if admissible, was harmless. Whether she was admitted to a mental health institute has no bearing on her failure to remedy the conditions which led to removal when the statute does not require that the parent's failure be willful. *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) ("A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

B.

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2018) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. The statute does not require that only the original conditions leading to

- 7 -

removal be used to establish grounds for termination. On the contrary, the statute specifically includes both "[t]he conditions that led to the child's removal . . . or other conditions [] that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

Mother argues that DCS failed to establish that the Children were subject to harm while with Mother or that they would be subject to harm if returned to her and that the Children never manifested any evidence of any persistent health or developmental problems caused by nutritional or environmental neglect. We disagree. Lyric was hospitalized as a result of Mother's nutritional neglect. Mother was homeless at the time of the hearing and without the ability to provide a stable and habitable residence in the near future. Furthermore, Mother's conduct also strongly suggests that the situation will not improve as evidenced by her prior involvement with DCS and termination of her parental rights to two other children, who were also initially removed based upon allegations of environmental neglect. *See Dep't of Children's Serv. v. C.B.H.*, No. E2003-03000-COA-R3-PT, 2004 WL 1698209, at *2 (Tenn. Ct. App. July 29, 2004) ("[T]he history of past behavior is relevant to the issue of future behavior."). Given her failure to maintain a habitable residence throughout the longevity of this case, we conclude that there is little likelihood that the conditions which led to removal will be remedied *at an early date* so that the Children can be safely returned in the near future and that the continuation of the relationship greatly diminishes the Children's chances of early integration into a safe, stable and permanent home. Accordingly, we conclude that the conditions which led to removal still persist.

C.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies

for such duration of time that lasting adjustment does not reasonably appear possible;[3]

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the

---

[3] *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

We acknowledge Mother's love and concern for the Children. However, the fact remains she has not made a lasting adjustment of circumstances in the almost four years that the Children have been in DCS custody, despite reasonable efforts by DCS to provide assistance. Tenn. Code Ann. § 36-1-113(i)(1), (2). Further, questions remain as to her ability to provide a safe and stable home for the Children as evidenced by her continued inability to maintain employment and a habitable residence. Tenn. Code Ann. § 36-1-113(i)(7), (8). The Children should be allowed to achieve permanency and stability in their current home with the foster parents who have expressed a desire to adopt them. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children. We affirm the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Mary W.

_____
JOHN W. McCLARTY, JUDGE